BISHOP *v.* LUCAS.

4-9741                                          251 S. W. 2d 126

Opinion delivered June 30, 1952.

Rehearing denied October 6, 1952.

*Henry E. Spitzberg,* for appellant.

*L. A. Hardin* and *Carl Langston,* for appellee.

GRIFFIN SMITH, Chief Justice. Nick Alvin was the only child of Kenneth and Wilma Lucas when they were

divorced May 21, 1951, on the husband's complaint. The boy was then three years and four months of age. The decree recited that the parties had entered into an agreement "suitable to both of them" regarding "possession, custody, and support of the child". There were, said the Chancellor, no rights to be settled as to alimony, attorney fees, cost, or division of property. The decretal findings were that Mrs. Lucas had been guilty of abuse, contempt, and studied neglect. Ark. Stat's, § 34-1202, fifth subdivision. The agreement was that the child should remain with its mother. In June, 1951, the father alleged that because of changed conditions, and because of facts not known to him when the divorce was granted, the original order should be superseded. The appeal is from a decree giving custody to Lucas.

.   .   .   .   .   .   .

Charles G. Bishop married in 1934. His wife, Lucy Irene, procured a divorce July 23d, 1951. Irene had a son by a former husband. The son was 29 years of age at the time this case was tried.

Bishop and Wilma Lucas were married July 25, 1951. Although the divorce decree granted on the wife's complaint is dated July 23d, it mentions a property adjustment executed July 18th. Bishop testified that he settled more than $60,000 on Irene. Costs and attorney's fees, he said, increased the expenditure to about $65,000.

Bishop had served in the army, but had been discharged several years before the transactions resulting in this litigation occurred.

Wilma married Lucas when she was 17. Her testimony was that she had not really loved Kenneth, but his letters (written from El Paso while on military duty) had over-persuaded her to take the matrimonial step. After being released from the armed service in 1946 Kenneth completed his education under G. I. allowances. For several months he was a student at Conway and received a bachelor's degree in biology. He then spent two years at Ft. Collins, Colorado, in the state A. & M., where in June, 1950, he received a master's degree in animal breed-

ing. Shortly before Lucas completed his work at Ft. Collins Wilma went to Mabelvale, Arkansas, and spent a month or two with her husband's parents, Mr. and Mrs. Charles W. Lucas.

Kenneth Lucas procured a position at Lonoke in September, 1950, as a veteran's instructor. Bishop had formerly been connected with Standard Oil Company as district superintendent, but at the time of matrimonial discord he owned a filling station on Asher avenue in Little Rock. As a side line he was interested in farming and livestock. Through mutual interests Bishop met Kenneth in October, 1950. Because of his knowledge of livestock and familiarity with that part of Colorado where he had attended college, Lucas agreed to go with Bishop on a combination hunting and stock-inspection trip. As a result Bishop purchased a blooded bull for his farm of 146 acres near Mabelvale. From that time until the early part of March, 1951, Charles and Irene Bishop and Wilma and Kenneth Lucas frequently visited, sometimes at the Lucas home in Lonoke, and sometimes at Bishop's home in Pulaski county.

On March 10, 1951, Kenneth re-enlisted in the army. His position as an instructor of veterans had ended and he was not able at that time to find employment commensurate with the army pay of a second lieutenant. He was sent to San Antonio, Texas, for study preliminary to an assignment to Fort Riley, Kansas. Lucas says that at the time he left Lonoke it was understood that Wilma and the little boy would promptly join him. Within a few days after Lucas reached San Antonio some one wrote him that Bishop and Wilma were having "an affair". Lucas called Wilma by telephone. She denied any misbehavior and, according to Lucas' testimony, promised him that she would leave at once for San Antonio. Instead of doing this she sent a telegram she could not come, but would write. Without waiting for the letter Lucas procured a short leave and returned to Lonoke. The result of their conversations was that Wilma announced she wanted a divorce. She had, in fact, written the letter mentioned during the conversation by telephone.

Lucas testified that he got Mr. and Mrs. Bishop together, and with Wilma, and with Bishop or Wilma separately, the disagreements were discussed. There is testimony that Bishop advised Wilma to wait six months and see if matters would not adjust themselves. On the other hand there is testimony that Bishop took a belligerent attitude. But Lucas, during the trial resulting in this appeal, insisted that he believed Wilma, did not suspect her of unfaithfulness, and merely consented to a divorce because she wanted it that way. He had formerly testified that during January, February, and March, ". . . and up until I went into the service, almost every-other night or two—or three times a week—we would go to [the Bishop] house, or they would come to Lonoke".

Mrs. Bishop testified that she became suspicious of the relationship between her husband and Wilma. Her apprehensions were aroused when the two would leave the room together and be away from the card table an abnormal length of time. On two occasions she trailed Bishop to Lonoke and claimed to have spied on him in the Lucas home after Kenneth went to Texas. There was evidence from disinterested sources that Bishop's car was frequently seen at the Lucas home. Mrs. Bishop claimed that she watched at night from a point of concealment in the Lucas yard and for nearly two hours observed transactions and heard conversations suggestive of adultery.

The printed abstract contains 530 pages, and the briefs add another 145 pages to the story of matrimonial distress. The Chancellor awarded the father full custody of Nicky on the theory that Bishop had broken up the Lucas home, that he was a man of positive convictions and violent temper, a heavy drinker; that he used profanity in the child's presence, and in other respects was not a suitable person to participate in the boy's family life. There was testimony that the paternal grandparents were wine and beer drinkers, that the small country home they occupied was inadequate, and that the environment there was not of the best. We do not rest our decision upon any of the evidence touching Mr. and Mrs. Charles W. Lucas.

Interested witnesses testified that Kenneth and his wife drank to excess, that while the card parties were in progress beer and whiskey were consumed, and that the boy was being taught to drink beer, swear, and use indecent words. In some instances the offending person was the father himself; at other times it was Bishop. Lack of supervision was attributed to Wilma.

We think the record justifies a belief that the so-called drinking and swearing prior to the time Kenneth left for Texas were chargeable to each man. Kenneth, in contending that Bishop swore in the child's presence, admitted that swearing occurred in his home when the card parties were on:—"Occasionally [Bishop] would use profanity. If the child was asleep I'd let it go, but if the child was awake I cautioned him right there". Kenneth also admitted having given the child beer, "But Bishop would try to give him excessive amounts".

When asked whether he made home brew in Nicky's presence, Kenneth replied, "I did while I was in school, and this child did not receive it then". Commenting on convivial customs pertaining to the card parties, Kenneth testified: "When [Lucas and his wife] would come down to play cards he would bring two-fifths with him about every night—nearly. He would drink two or three shots to my one. Then when we would go out to visit them, instead of feeling cheap, I bought a bottle and would bring it to his house. . . . I bought one-fifth at a time". In speaking of Nicky's agility, the father testified: "He is very alert and has been that way all his life. You have to watch him: that's right. I was not the one who actually gave the child beer in my household. I have given him drinks of beer, but Bishop would try to give him excessive amounts. I don't deny that. Sometimes I would have a can and [the child] would get it before I would have a chance to get it away from him, and I would stop him, [but] occasionally I gave him a drink of beer".

Question: "During the time you were living [with Wilma] did she take good care of the child?" A. "O, yes! She was a good mother". Q. She took good care of

him?" A. "Always! Sometimes she would say something and I would caution her about [it], but she was a good mother and tried to train the child well. If something happened and she couldn't control him she would say, 'Kenneth, will you get after Nicky?', or, 'Nicky, your Daddy is going to get you'. She would caution him that way".

It is difficult to determine which side prevailed respecting preponderating testimony regarding drinking, swearing, and secondary misconduct. A former state policeman testified that he knew Bishop well and had never seen him under the influence of intoxicants. Bishop swore that his drinking was of a very moderate kind, and that he positively did not touch liquor or swear in the child's presence. He appears to be devoted to Nicky. Mrs. Irene Bishop spoke highly of her own son, who had been reared and educated with Bishop's assistance. He is a wholesome, highly moral, non-drinking youth, and this is true notwithstanding the fact that the young man spent 17 years in the environment Mrs. Irene Bishop now so bitterly assails.

Appellee's testimony that he believed his wife when she told him there was no ground for suspicion regarding her relationship with Bishop is unconvincing. It is inconceivable that a husband and the father of a small child would continue the familiar social contacts Lucas admits if the course of conduct Mrs. Irene Bishop testified to obtained during the period in question. Certainly Lucas was aware of the whispered scandal when the divorce decree was rendered May 21st. At that time he wanted Wilma to have the child. Her subsequent relations with Bishop appear to have been the provocation actuating the custody proceedings. The custody agreement, of course, was not binding on the court. *Marr v. Marr*, 213 Ark. 117, 209 S. W. 2d 456. In *Aucoin v. Aucoin*, 211 Ark. 205, 200 S. W. 2d 316, it was said that no inviolate rule as to custody has been established by this Court, the thought being that each case must be adjudged on its peculiar facts.

Here the father admits the mother's love for the child and her capability in caring for it. The only complaint is that Bishop's conduct has changed the relationship so far that the child should be taken from its mother's new home and placed with the grandparents. This, we think, was a mistake, although the case is not free from pathetic angles.

The decree is reversed, with directions that an immediate mandate issue, giving custody to the mother. However, each party will pay his or her own costs and attorney's fees.

Mr. Justice WARD dissents.